Richard KIRBY, Appellant,

v.

STATE of Indiana, Appellee.

No. 1284S482.

Supreme Court of Indiana.

Aug. 5, 1985.

Rehearing Denied Oct. 25, 1985.

James V. Tsoutsouris, Public Defender, Porter County, James A. Johnson, Chief Deputy Public Defender, Portage, for appellant.

Linley E. Pearson, Atty. Gen., John D. Shuman, Deputy Atty. Gen., Indianapolis, for appellee.

GIVAN, Chief Justice.

Appellant was convicted by a Jury of Murder in the death of his five year old son. The court sentenced appellant to sixty (60) years imprisonment.

The facts are: Appellant and Judy Kirby are the parents of two sons, Richie and Jason, the decedent. At the time of the incident, appellant and Judy were separated and Judy had custody of the sons. Richie and Jason spent the evening of December 9, 1983, at the home of their baby-sitter, Linda Trosper. Linda Trosper and Judy Kirby planned that Jason would also spend the evening of the 10th at the Trosper home.

Appellant went to the Trosper home at approximately 1:30 p.m. to take Jason for an afternoon of activity. Appellant and Jason returned to the Trosper residence at 3:30 p.m. to inform Mrs. Trosper that they planned to go to a game room. Appellant returned at 4:10 p.m. and stated he was leaving Jason there for the evening. Mrs. Trosper did not see Jason when appellant returned at 4:10 p.m. When she inquired of appellant as to where Jason was, appellant indicated Jason had not come into the house but had stayed outside to play with the other children. Appellant spent only two or three minutes at the home before he left.

A few minutes after appellant left her home Mrs. Trosper began to look for Jason. She saw no children playing outside and she became concerned. She and her husband canvassed the neighborhood and discovered that no neighborhood children had been playing outside for some time. Mrs. Trosper became suspicious that appellant had kidnapped his own son. She called the police and Mrs. Kirby.

Several witnesses placed appellant and Jason in a local fast-food restaurant several minutes after he allegedly left Jason at the Trosper's. Additionally, witnesses placed appellant in a nearby tavern at 4:30 p.m. There he drank one beer very quickly and left. These same witnesses indicated appellant was a frequent customer and unlike his usual behavior appellant appeared to be attempting to have people notice his presence.

After Judy Kirby arrived at the Trosper home, she and Mrs. Trosper drove to several places appellant often frequented. They left word that a child was missing and that appellant should contact them as soon as possible. At approximately 8:00 p.m. appellant entered one of those establishments and was informed of the problem. He immediately called the Trosper home. Appellant indicated he would leave immediately for their home. Mr. Trosper called the police and determined that the police wished to talk with appellant. Trosper convinced appellant to go to the police station.

The police attempted to persuade appellant to tell them where he had hidden the child. They indicated their only concern was for the safety of the child. After filing the missing child report, Judy, appellant and the officers returned to the Trosper home to join the search which was already in progress. A police officer, who helped appellant search for his son, testified as to appellant's perfunctory efforts during the search. Between 11:15 p.m. and 11:30 p.m. Jason's body was found along a road in a deserted area about seven miles from the Trosper home. Appellant identified the child as Jason. Jason was taken to a nearby hospital where he was pronounced dead.

The police took appellant to the location where the body had been discovered. Appellant asked several questions concerning the recovery of evidence from the scene. Appellant also volunteered to one officer, "I shouldn't have, I mean this shouldn't have happened, how can I...." Appellant turned away during the final phrase and

the officer could not hear its conclusion. Appellant was then taken to the police station. The officer there informed appellant of Jason's death. One officer described his reaction as a faked cry. Appellant was then informed of his rights and questioned.

Appellant gave the police an exculpatory statement concerning his whereabouts from 4:00 p.m. until 8:00 p.m. The officers decided to release appellant for the moment. Before releasing appellant they requested, and he consented to, a testing of his hands and clothing for the presence of residual gunpowder. After the test on his hands had been completed and a change of clothing provided, appellant left. He was rearrested four days later following the positive results of the testing of the clothing.

Appellant's first trial resulted in a hung jury. He was then retried and this appeal flows from that trial.

■ Appellant's first issue concerns the court's ruling on appellant's motion for change of venue. The court, after denying the motion, did attempt to implement the provisions of Ind.Code § 34-2-9-2. The statute provides:

"Sec. 2. In any criminal proceeding wherein the defendant is charged with murder or a Class A felony to be tried before a jury in which a motion for a change of venue from the county is filed, the court may recognize but decline to grant the motion, and order that the jury be drawn from the residents of a county other than the county in which the court is located.

(b) Pursuant to an order under this section, the court may convene in any county in the state for purposes of jury selection. The venire may be drawn by the jury commissioners of a court in the jurors' home county, or may be drawn by the court itself by random selection.

(c) After a jury is selected, the trial shall be held in the county of the court's location. The verdict of the jury and the judgment based upon it have the same validity and effect as if the jury had been drawn from the county of the court's location."

Judge Douglas convened the court in Marshall County for the purpose of selecting the jury. However, only five jurors from Marshall County eventually served on the jury. In his order the court explained that he was unable to obtain more Marshall County jurors willing to serve in Porter County. The court then reconvened in Porter County to select the remainder of the jury. The jury thus consisted of five jurors from Marshall County and seven jurors from Porter County.

Appellant claims the court failed to properly comply with the requirements of the statute. He contends the statute requires the jury in its entirety to be selected from the residents of the other county. We agree. The language of the statute does not suggest this mechanism was designed to select only a portion of the jury. Rather the statute provides a cost-effective alternative to moving an entire case to another venue. The remaining question is what result is to be given to this failure to comply?

Appellant cites *Cross v. State* (1979), 272 Ind. 223, 397 N.E.2d 265 for the proposition that when a court fails to substantially comply with a venire selection procedure then a remand is required. We find *Cross* is not applicable. The issue in the case at bar is not the method of selecting jurors but rather the venue or location of the jury pool. Appellant does not argue error in the method used to select individual jurors or in the method used to form the potential pool from the citizens of either county. In essence he contends he was entitled to a jury pool consisting of only Marshall County citizens. We find that if appellant were entitled to a change of venue from Porter County then he was entitled to a jury pool consisting of only citizens from another county. *See Kappos v. State* (1984), Ind., 465 N.E.2d 1092.

"In order to obtain a change of venue from the county, however, it was incumbent upon Defendant to produce evidence of community bias or prejudice sufficient

to convince the trial judge that he could not obtain a fair trial in that county. *Dorton v. State*, (1981) Ind., 419 N.E.2d 1289. In order to do this, Defendant needed to demonstrate that the adverse publicity made the potential jurors unable to set aside their preconceived notions of guilt and to render a verdict based upon the evidence." *Tabor v. State* (1984), Ind., 461 N.E.2d 118, 125. This Court may examine the *voir dire* record to determine the validity of the change of venue motion. *Kappos supra; Grooms v. State* (1978), 269 Ind. 212, 379 N.E.2d 458.

Appellant points to the court's attempted use of Ind.Code § 34-2-9-2 and comments made by the court to the potential Marshall County jurors as implicit judicial findings of the existence of prejudice warranting a change of venue. The court stated:

"I think a little background or introduction is necessary. This case was tried one time in March of this year in Porter County and the jury was unable to agree on a decision, so we're here to try it a second time. You would find this out during the course of the proceedings, I'm sure. So that's the reason we're here. There is a new state law that allows courts from other counties to use citizens of another county to try a case. This we felt was necessary, both the State and the Defendant and the Court, because there was quite a bit of publicity that surrounded the first case in Porter County, thought it would be pretty difficult to select a jury of just Porter County residents."

In addition appellant introduced several newspaper articles which appeared during the investigation and first trial.

■ A review of the *voir dire* reveals the court and the parties extensively questioned the potential jurors. We find the court was able to select seven Porter County jurors who were able to render a verdict based on the evidence and not on their preconceived notion of guilt. Thus we find the court did not commit reversible error as appellant was not entitled to a change of

venue for cause. However, we do reiterate that if appellant had been entitled to a change of venue for cause then the empaneling of a jury consisting of any member of the suspect county would be reversible error.

Appellant next alleges the court erred when it admitted articles of appellant's clothing and the results of tests performed thereon. Appellant argues the clothing was seized pursuant to an arrest for which the police lacked probable cause. He cites *Triplett v. State* (1982), Ind., 437 N.E.2d 468 for the proposition that if a defendant is taken into custody without probable cause and interrogated against his will then the State will not be permitted to utilize the product of that illegal detention.

■ The State argues probable cause did exist and further that appellant waived any reversible error by failing to object to the introduction of the test results. Appellant did object to the admission of the clothing but not to the test results. Appellant has thus waived any error related to the admission of the test results. *McCraney v. State* (1981), Ind., 425 N.E.2d 151.

■ As to the question of the admission of the clothing, we find no error. Probable cause exists when, "[A]t the time of arrest, the arresting officer has knowledge of facts and circumstances which would warrant a man of reasonable caution to believe that the defendant committed the criminal act in question." *Green v. State* (1984), Ind., 461 N.E.2d 108, 112. The facts were known to the police at the time of the arrest. Appellant maintains the fact the police released him on the evening of the incident is indicative of a lack of probable cause to make the initial arrest. We do not agree. Probable cause goes to the question of the knowledge possessed by the police at the time of the arrest. We hold the facts presented above support the determination that probable cause did exist. Thus all evidence obtained pursuant to that arrest was admissible.

■ Appellant next maintains the court erred when it denied his challenge of a

juror for cause after the commencement of the trial. After trial had proceeded for two days, appellant's counsel was informed of a pretrial statement allegedly made by juror Jones. In the statement he purportedly stated he intended to get on this jury and "burn the defendant." Counsel informed the court of the statement and the court held a hearing on the matter. The court took the testimony of the witness who claimed to hear the juror speak to a group of fellow workmen. She testified she heard him make the alleged statement. The court also questioned the juror. He denied making the statement. After hearing the testimony of the two witnesses the court denied appellant's challenge for cause. Based upon the answers provided by the juror we do not find the court abused its discretion.

Appellant contends the trial court erred when it permitted a police officer to testify that appellant "appeared to fake cry" when informed of the death of his son. Appellant cites cases which hold that a police officer may testify only to facts and that his conclusions and opinions are inadmissible. *State v. St. Anne Brick and Tile Co.* (1968), 142 Ind.App. 338, 234 N.E.2d 664; *Lee v. Dickerson* (1962), 133 Ind.App. 542, 183 N.E.2d 615.

■ We first note appellant failed to challenge the testimony with a motion to strike the answer, a motion for mistrial or a request for an admonition. As the answer preceded the objection, this is required to preserve the issue for appellate review. *Pettit v. State* (1982), Ind.App., 439 N.E.2d 1175.

■ Nevertheless we believe the testimony was admissible under what has become known as the short-hand rendition of the facts exception to the opinion rule. Recently the Missouri Court of Appeals articulated the standard for the application of the exception.

> "The test for allowing such is that when it is impossible or extremely difficult for a witness to convey an accurate and actual meaning, and the nature of the thing described may be more clearly and prac-

tically conveyed to the jury by a summary of the witness's impressions, or by comparison with some ordinary object or condition familiar to the court or jury, then the practical administration of justice requires acceptance of the testimony even though it may be, in a sense, the conclusion of the witness." *Travelers Indemnity Co. v. Woods* (1983), Mo.App., 663 S.W.2d 392, 399.

We hold the statement "he appeared to fake cry" falls within this exception. This is true even though the same officer later was able to testify concerning the observations of appellant's conduct which formed the basis for the conclusionary statement. The trial court was in the best position to determine whether, at that moment, it was impossible or extremely difficult for the officer to convey to the jury his mental impressions of these observable facts in a manner other than that employed.

The trial court is in all things affirmed.

All Justices concur except HUNTER, J., not participating.